**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2020-NMSC-009**

**Filing Date: June 11, 2020**

**No. S-1-SC-37021**

**STATE OF NEW MEXICO,**

      Plaintiff-Petitioner,

v.

**ROY D. MONTANO,**

      Defendant-Respondent,

and

**No. S-1-SC-37098**

**STATE OF NEW MEXICO,**

      Plaintiff-Respondent,

v.

**WILLIAM DANIEL MARTINEZ,**

      Defendant-Petitioner.

**ORIGINAL PROCEEDINGS ON CERTIORARI**
**District Judges Fred T. Van Soelen and Karen L. Townsend**

Released for Publication August 11, 2020.

Hector H. Balderas, Attorney General
John J. Woykovsky, Assistant Attorney General
Santa Fe, NM

for State of New Mexico

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Petitioner William Daniel Martinez

Eric D. Dixon
Portales, NM

for Respondent Roy D. Montano

**OPINION**

**VIGIL, Justice.**

**{1}** These consolidated cases give us the opportunity to define "uniformed law enforcement officer" and "appropriately marked law enforcement vehicle" under NMSA 1978, Section 30-22-1.1(A) (2003), which defines the crime of aggravated fleeing from a law enforcement officer.[1] Violation of Section 30-22-1.1 is a fourth-degree felony that "consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by *a uniformed law enforcement officer* in an *appropriately marked law enforcement vehicle* in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act." (Emphasis added.)

**{2}** We granted certiorari (1) in *State v. Montano*, 2018-NMCA-047, 423 P.3d 1, to review the reasoning of *Montano* and consider whether the law enforcement officer was "uniformed" under Section 30-22-1.1(A) and (2) in *State v. Martinez*, A-1-CA-35111, mem. op. (May 14, 2018) (nonprecedential), to review the *Montano* reasoning and consider whether the law enforcement officers in *Martinez* and *Montano* were each in an "appropriately marked law enforcement vehicle" under Section 30-22-1.1(A). We affirm the Court of Appeals determination of what constitutes a "uniformed law enforcement officer" and reject its determination of what constitutes an "appropriately marked law enforcement vehicle" and therefore conclude that the officer in *Montano* was not a "uniformed law enforcement officer" and that neither the officer in *Montano* nor the officer in *Martinez* was in an "appropriately marked law enforcement vehicle."

## I.    BACKGROUND

### A.    *State v. Montano*

**{3}** After an automobile pursuit, Curry County Sheriff's Deputy Glenn Russ arrested Defendant Roy Montano. The State charged Defendant Montano with one count of aggravated fleeing from a law enforcement officer, § 30-22-1.1, and one count each of driving with a revoked license, NMSA 1978, § 66-5-39.1 (2013), driving with an expired

---

[1]Defendant Roy Montano died on May 20, 2017. We appointed a substitute for the deceased defendant to allow the appeal to proceed, per Rule 12-301(A) NMRA. This Court, "on its own initiative," can "appoint a substitute for a deceased party-defendant" if resolving an appeal is "in the best interests of . . . society." *State v. Salazar*, 1997-NMSC-044, ¶ 25, 123 N.M. 778, 945 P.2d 996.

motor vehicle registration, NMSA 1978, § 66-3-19 (1995), and driving with no insurance, NMSA 1978, § 66-5-205(B) (2013).

**{4}**     In his statement of probable cause, Deputy Russ wrote that he began to follow Defendant Montano after seeing a Hispanic male he initially believed to be an individual he knew to have had "a warrant in the past" get into a four-door Saturn and begin driving. Deputy Russ stated that his purpose in following this individual was to verify the driver's identity. After catching up to the Saturn and running the license plate, Deputy Russ learned that the plate was expired. Deputy Russ wrote that he then activated the emergency lights on his vehicle "to [e]ffect a traffic stop for the violation and positively identify the driver." Deputy Russ stated that the vehicle did not stop, ran multiple stop signs, and drove in a manner that posed a safety risk to the public before sliding through an intersection, striking a curb, and coming to rest on an easement.

**{5}**     Defendant Montano waived his right to a jury trial. At the bench trial the evidence included testimony from Deputy Russ that he worked as an "investigator" with the Curry County Sheriff's office and wore the clothing required of investigators: "a dress shirt with tie, dress slacks, and dress shoes." Deputy Russ wore his badge displayed on the breast pocket of his shirt, but there was no testimony describing the badge itself, its wording, or the size of the wording. Deputy Russ drove a Ford Expedition that had no decals, striping, insignia, or lettering anywhere on the vehicle. However, the vehicle was equipped with wigwag headlights, red and blue flashing lights mounted in the front grill and the top rear window, flashing brake lights, and a siren. The vehicle also had a government license plate. The district court took judicial notice that the vehicle "was not a marked vehicle."

**{6}**     At the close of the State's case-in-chief, Defendant Montano moved for a directed verdict on the aggravated fleeing charge, asserting that the State failed to prove that Deputy Russ was uniformed or in an appropriately marked law enforcement vehicle, as required by Section 30-22-1.1(A), when Deputy Russ attempted to stop him. The district court ruled that displaying a badge was sufficient to be considered in uniform and that Deputy Russ's vehicle was "appropriately marked" because motorists understand that they are required to pull over and stop when they see emergency lights. The district court therefore denied Defendant Montano's motion, found Defendant Montano guilty of aggravated fleeing, and imposed the maximum sentence of eighteen months imprisonment. Montano appealed to the Court of Appeals.

**{7}**     The Court of Appeals reversed Defendant Montano's conviction. *Montano*, 2018-NMCA-047, ¶ 1. The Court of Appeals concluded that Deputy Russ's vehicle was an "appropriately marked law enforcement vehicle" as required by Section 30-22-1.1(A) but that the clothes that Deputy Russ was wearing "did not constitute a uniform" and therefore did not comply with the statute. *Montano*, 2018-NMCA-047, ¶ 1. We granted the State's petition for a writ of certiorari seeking review of the Court of Appeals conclusion that Deputy Russ was not uniformed at the time of the stop as required by Section 30-22-1.1(A).

**B.** *State v. Martinez*

**{8}** Defendant William Daniel Martinez was arrested pursuant to an arrest warrant and charged with one count of aggravated fleeing from a law enforcement officer, § 30-22-1.1. The affidavit in support of the arrest warrant states that on July 14, 2014, San Juan County Sheriff's Deputy Andrew Gilbert received information alleging that Defendant Martinez, who had several active felony and misdemeanor warrants, was at a residence in Farmington. When Deputy Gilbert arrived in that area, he observed a car matching the description of the vehicle Defendant Martinez allegedly drove that was pulling out of a trailer park. Deputy Gilbert recognized Defendant Martinez as the driver through several previous contacts with him. Apparently recognizing that Deputy Gilbert was driving behind him, Defendant Martinez ran a stop sign and made several evasive maneuvers. Deputy Gilbert initiated the emergency equipment on his "unmarked patrol vehicle" and pursued Defendant Martinez who ran additional stop signs, swerved to avoid hitting pedestrians, and on several occasions slid into intersections and drove down oncoming traffic lanes. Deputy Gilbert eventually abandoned the pursuit. Defendant Martinez was subsequently arrested pursuant to the arrest warrant.

**{9}** Prior to trial, Defendant Martinez filed a motion to dismiss the criminal information, asserting that that Deputy Gilbert "was in an unmarked vehicle, no more conspicuous than any other lay vehicle" when he attempted to stop Defendant Martinez. Defendant Martinez contended that Deputy Gilbert was therefore not in an appropriately marked law enforcement vehicle as required by Section 30-22-1.1(A).

**{10}** After an evidentiary hearing, the district court granted Defendant Martinez's motion and dismissed the criminal information without prejudice. The district court found that the following facts were undisputed. Deputy Gilbert was on duty "driving a tan colored Ford Explorer law enforcement vehicle." The vehicle was specifically furnished for covert operations intended to evade detection. "By design, the vehicle bore no insignias, stripes, decals, labels, seals, symbols or other pictorial signs or lettering indicating its identity as a law enforcement vehicle." The vehicle was also equipped with "red and blue LED lights located within the grill area that were visible through the grill even when not activated." In addition, the vehicle had a siren with speakers located inside the grill as well as "an antenna that is not common to civilian vehicles."

**{11}** Under these facts the district court made the following conclusions of law. "To be marked, much less 'appropriately marked,' requires at minimum some type of readily observable insignia or lettering that conveys the identity or ownership of the vehicle." In addition, "[t]he red and blue lights and the siren speakers located within the grill area of the vehicle were signaling devices, not identifying marks. To the extent the State argues these signaling devices satisfy" the requirement of Section 30-22-1.1(A) "that the pursuing law enforcement vehicle be appropriately marked," the district court disagreed. Specifically, the district court stated that Section 30-22-1.1(A) requires a signal to stop by means of "emergency light, flashing light, siren or other signal" made by an officer driving "an appropriately marked law enforcement vehicle." The district court continued, "If the lights and siren themselves constituted the required marking, it would render the

requirement that the vehicle be appropriately marked a mere surplusage in the statute which statutory construction does not favor." The district court ruled that in the absence of "evidence that Deputy Gilbert's vehicle was marked at all, the State cannot make a prima facie showing of all elements of the crime of aggravated fleeing a law enforcement officer . . . as a matter of law." The State appealed.

**{12}** Relying on the reasoning in *Montano*, 2018-NMCA-047, ¶¶ 35-47, the Court of Appeals summarily reversed the district court. *Martinez*, A-1-CA-35111, mem. op. ¶¶ 1-2. Defendant Martinez filed a petition for a writ of certiorari, which this Court granted, seeking review of the Court of Appeals conclusion that Deputy Gilbert was driving an "appropriately marked law enforcement vehicle" as required by Section 30-22-1.1(A).

## II.    STANDARD OF REVIEW

**{13}** These cases require us to construe Section 30-22-1.1(A). "[W]e review all questions of . . . statutory interpretation de novo." *State v. Ameer*, 2018-NMSC-030, ¶ 9, 458 P.3d 390. "Our primary goal when interpreting a statute is to determine and give effect to the Legislature's intent." *State v. Suazo*, 2017-NMSC-011, ¶ 15, 390 P.3d 674 (internal quotation marks and citation omitted). "Under the rules of statutory construction, we first turn to the plain meaning of the words at issue, often using the dictionary for guidance." *State v. Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830. We give effect to the plain meaning of the statute "unless the language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, in which case the statute is to be construed according to its obvious spirit or reason." *State v. Tafoya*, 2010-NMSC-019, ¶ 10, 148 N.M. 391, 237 P.3d 693 (internal quotation marks and citation omitted). "When application of the plain meaning of the statute fails to result in a reasonable or just conclusion, we examine legislative history and the overall structure of the statute and its function in the comprehensive legislative scheme." *Id.* (internal quotation marks and citation omitted). The language of a statute "may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (internal quotation marks and citation omitted). When possible, "we must read different legislative enactments as harmonious instead of as contradicting one another." *Id.* (internal quotation marks and citation omitted).

## III.    UNIFORMED LAW ENFORCEMENT OFFICER

**{14}** The State argues that when he stopped Defendant Montano, Deputy Russ was a "uniformed law enforcement officer" as required by Section 30-22-1.1(A). The State asserts that this conclusion is supported by the plain meaning of "uniform," by the purpose of Section 30-22-1.1(A), and by related statutes and case law discussing what constitutes a uniformed police officer. Defendant Montano in turn contends that the Court of Appeals correctly concluded that Deputy Russ was not a "uniformed law enforcement officer" at the time of the stop.

## A.    Court of Appeals Opinion

**{15}**    In concluding that Deputy Russ was not uniformed at the time he attempted to stop Defendant Montano, the Court of Appeals organized its analysis around four topics: (1) the plain meaning of "uniform," (2) New Mexico statutes related to the subject matter of Section 30-22-1.1, (3) related New Mexico case law, and (4) whether applying the plain meaning of "uniform" to Section 30-22-1.1 leads to an absurd result or one that is clearly contrary to the intent of the Legislature. *See Montano*, 2018-NMCA-047, ¶¶ 10, 14, 21, 31.

### 1.    Plain meaning of "uniform"

**{16}**    In *Montano*, the Court of Appeals began its analysis by considering the plain meaning of "uniform." *Id.* ¶ 11. Looking to the definition stated in *Webster's Third New International Dictionary* 2498 (unabr. ed. 1986), the Court of Appeals observed that the meaning of "uniform" is "*dress* of a *distinctive* design or fashion adopted by or prescribed for members of a particular group . . . and serving as a means of identification." *Montano*, 2018-NMCA-047, ¶ 11 (omission in original) (internal quotation marks omitted). The Court of Appeals further observed that *Webster's Third New International Dictionary* 689 (unabr. ed. 1986) defines "dress" as "utilitarian or ornamental covering for the human body: as . . . clothing *and* accessories suitable to a specific purpose or occasion." *Montano*, 2018-NMCA-047, ¶ 11 (omission in original) (internal quotation marks omitted).

**{17}**    The Court of Appeals found these definitions significant for two reasons. The first is that "a uniform consists of clothing, as distinguished from, for example, only a law enforcement officer's badge." *Id.* ¶ 12. In other words, the Court of Appeals noted that "equipment alone, without distinctive clothing, is not 'dress of a distinctive design or fashion[,]' i.e., it is not a uniform." *Id.* (alteration in original) (citation omitted). In support of the conclusion that there is a meaningful distinction between a uniform and a badge, the Court of Appeals cited 2.110.3.8(B)(2) NMAC, which distinguishes "[guns,] holsters, . . . uniforms, belts, badges and related apparatus" for use by law enforcement officers "as items eligible for purchase with funds from the Law Enforcement Protection Fund Act, NMSA 1978, §§ 29-13-1 to -9 (1993, as amended through 2017)." *Montano*, 2018-NMCA-047, ¶ 12 (omission in original) (internal quotation marks omitted)*.* The second significant aspect of the meaning of "uniform" noted by the Court of Appeals is that "a uniform is clothing that distinguishes the wearer from the general public, i.e., identifies him or her as a member of a particular group." *Id.*

**{18}**    Under this construction of the plain meaning of "uniform," the Court of Appeals determined that Deputy Russ was not uniformed at the time he initiated the stop of Defendant Montano because the Deputy's "clothing was not of a distinctive design or fashion and did not serve to identify him as a law enforcement officer." *Id.* ¶ 13. Rather, "the purpose of his outfit was, if anything, to allow him to blend in with the general public." *Id.* Further, while acknowledging that a badge or even handcuffs and a

holstered firearm may identify the person as a law enforcement officer, they are not "clothing" and therefore not a uniform. *Id.*

## 2. Related New Mexico statutes

**{19}** The Court of Appeals next considered Section 30-22-1.1(A) in relation to several other statutes that address law enforcement officers' uniforms and officers' authority to stop motorists. *See Montano*, 2018-NMCA-047, ¶¶ 14-15. The Court of Appeals focused on the following statutes:

- NMSA 1978, § 29-2-13 (1989) (stating that the secretary of public safety shall "provide and issue" to all New Mexico state police officers "a *uniform and an appropriate badge* which shall contain in plain legible letters the words 'New Mexico state police'" (emphasis added)).

- NMSA 1978, § 29-2-14(A) (2015) (defining the crime of unauthorized wearing of a uniform or badge as "the wearing or requiring the wearing, without authorization by the secretary, of a *uniform or badge or both* whose material, color or design, or any combination of them, is such that the wearer appears to be a member of the New Mexico state police" (emphasis added)).

- NMSA 1978, § 30-22-1(C) (1981) (defining the crime of resisting, evading or obstructing an officer, as "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle").

- NMSA 1978, § 66-8-124(A) (2007) (stating that "[*n*]o person shall be arrested for violating the Motor Vehicle Code or other law relating to motor vehicles punishable as a misdemeanor except by a commissioned, salaried peace officer who, at the time of arrest, is wearing a uniform clearly indicating the peace officer's official status" (emphasis added)).

- NMSA 1978, § 66-8-125(C) (1978) (stating that "[m]embers of the New Mexico state police, sheriffs, and their salaried deputies and members of any municipal police force may not make [a warrantless] arrest for traffic violations *if not in uniform*" (emphasis added)).

- NMSA 1978, § 66-7-332(A) (2005, amended 2017) (stating that "[u]pon the immediate approach of an authorized emergency vehicle displaying flashing emergency lights or when the driver is giving audible signal . . . , the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection and shall stop and remain in that position until the authorized emergency vehicle has passed, except when otherwise

directed by a police officer); NMSA 1978, § 66-8-116(A) (2016, amended 2019) (assessing a $50 fine for violation of Section 66-7-332 (2005)).

*See Montano*, 2018-NMCA-047, ¶¶ 6, 16-20.

**{20}** Construing the statute "in accordance with the plain meaning of 'uniform[,]'" the Court of Appeals concluded that Section 30-22-1.1(A) is "harmonious" with the foregoing statutes. *Montano*, 2018-NMCA-047, ¶ 15. First, the Court of Appeals observed that Section 29-2-13 and Section 29-2-14, which address the uniforms and badges of the New Mexico State Police and the crime of unauthorized wearing of a uniform or badge, each "distinguish between a uniform and a badge." *Montano*, 2018-NMCA-047, ¶ 16. This distinction, the Court of Appeals continued, reflects "the Legislature's understanding that, while a uniform and badge are both indicia of law enforcement officer status, the two are different—i.e., a badge is not simply a part of a uniform." *Id.*

**{21}** Second, the Court of Appeals noted that the legislative history of Section 66-8-124(A) is consistent with the distinction between a uniform and a badge. *Montano*, 2018-NMCA-047, ¶ 17. When the statute was enacted in 1961 under the prior compilation, it stated, "In the Motor Vehicle Code, 'uniform' means an official badge prominently displayed, accompanied by a commission of office." NMSA 1953, § 64-22-8.1 (1961). However in 1968, also under the prior compilation, this sentence was removed from the statute, and it was amended to include the current language that no person shall be arrested for a violation of the Motor Vehicle Code except by a law enforcement officer "who, at the time of arrest, is wearing *a uniform* clearly indicating his official status." NMSA 1953, § 64-22-8.1 (1968) (emphasis added). Based on these changes, the Court of Appeals stated, "The most logical inference to be drawn from the 1968 amendment is that . . . the Legislature determined that a badge should not be considered part of a uniform and instead is a separate indicia of law enforcement officer status." *Montano*, 2018-NMCA-047, ¶ 17; *compare* NMSA 1953, § 64-22-8.1 (1961), *with* NMSA 1953, § 64-22-8.1 (1968).

**{22}** Third, the Court of Appeals noted that Section 66-8-125(C), requiring any law enforcement officer making an arrest for traffic violations to be "in uniform," tracks the language of Section 66-8-124(A). *Montano*, 2018-NMCA-047, ¶ 18.

**{23}** Finally, the Court of Appeals observed that Section 66-7-332, Section 66-8-116, Section 30-22-1(C), and Section 30-22-1.1(A), when viewed together, evince "a common general legislative intent: enforcing, by means of progressively greater sanctions for disobedience, the public policy imperative that a motorist must promptly pull off to the side of the road and stop when he or she notices a law enforcement vehicle that has its emergency lights and/or sound equipment engaged." *Montano*, 2018-NMCA-047, ¶ 20. The Court of Appeals noted that compared to penalties for violation of traffic laws such as Section 66-7-332, the greater penalties for violating Section 30-22-1(C) (a misdemeanor) or Section 30-22-1.1(A) (a fourth-degree felony under Section 30-22-1.1(B)) stem in part from the fact that the motorist's failure to stop

was willful and "objectively clear (based on visual and audible signals, a uniform, and appropriate markings on a vehicle) that it is a law enforcement officer who is signaling the motorist to stop." *Montano*, 2018-NMCA-047, ¶ 20.

### 3.  Related New Mexico case law

**{24}**  considering the related case law, the Court of Appeals focused its analysis on *State v. Archuleta*, 1994-NMCA-072, 118 N.M. 160, 879 P.2d 792, and *State v. Maes*, 2011-NMCA-064, 149 N.M. 736, 255 P.3d 314. *Montano*, 2018-NMCA-047, ¶¶ 21-30.

**{25}**  In *Archuleta*, the defendant was stopped for speeding. 1994-NMCA-072, ¶ 2. The officer who made the stop was in plain clothes. *Id.* Before approaching the driver, the officer retrieved his Albuquerque Police Department windbreaker from the back seat of his car. *Id.* The windbreaker had a cloth shield on the front that read "Albuquerque Police" and a patch on the shoulder with the state of New Mexico emblem and the words "Albuquerque Police" on it. *Id.* "Recognizing that there may be a problem with [the d]efendant signing the citation," the officer radioed for a fully uniformed officer to be present before issuing the citation to the defendant. *Id.* ¶ 3. Two fully uniformed, on-duty officers arrived, and the officer who made the stop issued the citation. *Id.* The defendant was found guilty of speeding and appealed, arguing for reversal pursuant to NMSA 1978, Section 66-8-137(B) (1978, recompiled from NMSA 1953, Section 64-8-137 (1968)) (providing that for purposes of an alleged violation of the Motor Vehicle Code, the fact "that the person making the arrest was not in uniform at the time is a defense to the charge"). *Archuleta*, 1994-NMCA-072, ¶ 6.

**{26}**  On appeal, the Court of Appeals, looking to the history of Section 66-8-124, observed that the pre-1968 version of the statute (NMSA 1953, § 64-22-8.1 (1961)) included an additional sentence stating that in the Motor Vehicle Code, "'uniform' means an official badge prominently displayed, accompanied by a commission of office." *Archuleta*, 1994-NMCA-072, ¶ 10 (internal quotation marks omitted). The Court of Appeals stated, "We believe that the deletion of that language suggested that the legislature intended the definition of 'uniform' to be less restrictive, no doubt recognizing that modern day police officers may have more than one uniform or may on occasion wear combinations thereof." *Id.* The Court of Appeals noted, "It seems clear enough that the intention of the legislature in requiring the officer to wear a uniform plainly indicating his official status was to enable the motorist to be certain that the officer who stops him is, in fact, a police officer." *Id.* ¶ 9. Given the definition, history, and intent of Section 66-8-124, the Court of Appeals established two alternative tests to determine whether an officer is uniformed for purposes of the statute: (1) "whether there are sufficient indicia that would permit a reasonable person to believe the person purporting to be a peace officer is, in fact, who he claims to be" or (2) "whether the person stopped and cited either personally knows the officer or has information that should cause him to believe the person making the stop is an officer with official status." *Archuleta*, 1994-NMCA-072, ¶ 11 (stating that the former, "objective test best suits more populated areas or persons traveling through the state" while the latter, "subjective test may be appropriate in small towns where everyone knows the constable and recognizes his official status").

**{27}** Reasoning that by wearing the windbreaker bearing the words "Albuquerque Police" in two places, a reasonable person would have inferred that the officer was in fact a peace officer. *Id.* ¶¶ 11-12. Accordingly, the Court of Appeals concluded that the facts established the objective test. *Id.* ¶ 12. In so concluding the Court of Appeals also rejected the defendant's argument that public policy supports the requirement that an officer making arrests or stops to issue citations must be in full uniform based on the risk of danger that citizens may be stopped by police impersonators. *Id.* ¶ 15. The Court of Appeals stated, "While we recognize that there is that risk, we are not persuaded that in this day and time when law enforcement uniforms are probably readily available, the risk would be that much lessened by requiring the officer to wear his or her full attire before making a stop or arrest." *Id.*

**{28}** Similarly in *Maes*, the Court of Appeals considered whether the New Mexico State Police Basic Duty Uniform (BDU) constituted a "uniform" as used in Section 66-8-124 and Section 66-8-125. *Maes*, 2011-NMCA-064, ¶ 1. A BDU is comprised of the following components:

> black pants; black boots; a black vest to which is attached an electronic communication device with a chord; a black long-sleeve shirt with the words "STATE POLICE" in large bold yellow lettering on the sleeves, the word "POLICE" in large bold white lettering on the right shoulder area, a smaller triangular cloth patch with the words "STATE POLICE" also on the right shoulder; and, on the back of the shirt, the word "POLICE" in large bold white lettering in two places; an equipment belt, holster, and firearm; and a metal police badge hung from one of the front pockets.

*Id.* ¶ 11. Wearing BDUs and driving an unmarked vehicle, two New Mexico State Police officers stopped the defendant when they witnessed him engage in multiple traffic infractions. *Id.* ¶ 3. During the stop, the officers discovered that the defendant had outstanding warrants, conducted a search incident to arrest, and discovered imitation drugs and drug paraphernalia while carrying out their search. *Id.* The defendant filed a motion to suppress the drugs and paraphernalia, arguing in pertinent part that the stop was unlawful because the officers were not uniformed within the meaning of Sections 66-8-124(A) and 66-8-125(C). *Maes*, 2011-NMCA-064, ¶ 4. The district court agreed and suppressed the evidence, concluding that the BDUs were not uniforms as contemplated by Sections 66-8-124(A) and 66-8-125(C). *Maes*, 2011-NMCA-064, ¶ 5. On appeal and applying *Archuleta*, the Court of Appeals concluded that under the objective test, a reasonable person would believe that an individual wearing a BDU is, in fact, a police officer. *Maes*, 2011-NMCA-064, ¶ 11. The Court of Appeals reasoned, "The word police is printed in large lettering in several locations on the garments comprising a BDU and an individual donning a BDU has equipment on their person consistent with what a police officer would possess." *Id.*

## 4.    Absurd results

**{29}** Finally, the Court of Appeals considered whether applying the plain meaning of "uniform" to Section 30-22-1.1(A) necessarily leads to unreasonable or absurd results. *Montano*, 2018-NMCA-047, ¶ 32. The Court of Appeals began with the proposition that "[r]equiring as an element of the crime that the pursuing officer be in uniform, i.e., clothing that in addition to a badge objectively identifies him or her as a law enforcement officer, is unreasonable only if one assumes that the intent of the statute is to criminalize all refusals to comply with a signal to stop, even by a nonuniformed officer." *Id.* Such a construction, the Court of Appeals continued, "would render meaningless . . . the word 'uniformed' in the statute." *Id.* This construction would further conflict with Sections 29-2-13 and 29-2-14, which draw a distinction between uniforms and badges. *Montano*, 2018-NMCA-047, ¶ 32. "Thus, if anything, the absurd or unreasonable result is reached by *not* applying the plain meaning of 'uniform.'" *Id.*

**{30}** The Court of Appeals concluded by stating that it was immaterial that "an argument might be made that it would be better policy to allow nonuniformed law enforcement officers to make arrests for violation of Section 30-22-1.1(A)" because the courts are required to give effect to the law as its written, "not as the court may think it should be or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration." *Montano*, 2018-NMCA-047, ¶ 34 (internal quotation marks and citation omitted).

## B. Analysis

**{31}** We conclude that the Court of Appeals interpretation of what constitutes a uniform under Section 30-22-1.1(A) is legally accurate, and we adopt its reasoning stated above as our own. We add the following additional observations.

**{32}** There is no indication in Section 30-22-1.1, or in the other criminal offense statutes in Chapter 30, Article 22 governing interference with law enforcement, that the Legislature intended the word uniform to be construed as meaning anything other than its common meaning. *See* NMSA 1978, § 12-2A-2 (1997) ("Unless a word or phrase is defined in the statute or rule being construed, its meaning is determined by its context, the rules of grammar and common usage."). In addition, defining "uniform" as used in Section 30-22-1.1(A) to mean "clothing *and* accessories" that are "of a *distinctive* design or fashion adopted by or prescribed for members of a particular group . . . and serving as a means of identification" resonates with the ordinary understanding of what a uniform is. *Montano*, 2018-NMCA-047, ¶ 11 (omission in original) (internal quotation marks and citations omitted). That is, a "uniform" is clothing in which one dresses to identify for a particular purpose, office, or profession. *See id.* Case law in other jurisdictions construing similar statutes comes to the same conclusion.

**{33}** In *People v. Mathews*, 64 Cal. App. 4th 485, 490-91 (Ct. App. 1998), the California Court of Appeal considered whether a police officer in plain clothes donning a badge and displaying a firearm on his belt was in uniform for purposes of the California Vehicle Code statute prohibiting flight from a pursuing peace officer. The statute, Cal. Veh. Code § 2800.1(a)(4) (West 2019), provides, "Any person who, while operating a

motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle" is guilty of a misdemeanor if, among other essential elements, "[t]he peace officer's motor vehicle is operated by a peace officer . . . and that peace officer is wearing a distinctive uniform." *Mathews*, 64 Cal. App. 4th at 488 (omission in original). In interpreting "distinctive uniform," the court applied the plain meaning of the word "uniform" defined in *Webster's Third New International Dictionary* 2498 (unabr. ed. 1986) as "dress of a distinctive design or fashion adopted by or prescribed for members of a particular group and serving as a means of identification." *Mathews*, 64 Cal. App. 4th at 490 (citing *People v. Estrella*, 31 Cal. App. 4th 716, 724 (Ct. App. 1995) (adopting the dictionary definition of "uniform" to interpret "distinctive uniform")). The court therefore concluded that a police officer's uniform is "clothing prescribed for or adopted by a law enforcement agency which serves to identify or distinguish members of its force." *Mathews*, 64 Cal. App. 4th at 490. Reasoning under the facts of the case that "a badge is not an article of clothing, [although] it may help to distinguish a law enforcement officer," the court concluded that the plain clothes officer with a badge was not in uniform for purposes of the California statute that prohibits willful fleeing from a police officer in pursuit. *Id.* at 491.

**{34}**   The Appellate Court of Illinois reached a similar conclusion in *People v. Williams*, 2015 IL App (1st) 133582, ¶ 1, 44 N.E.3d 534. In *Williams*, a police officer driving a marked police vehicle but wearing "civilian dress" apprehended the defendant who fled from the officer when the officer pursued him for not fully coming to a stop at a stop sign. *Id.* ¶ 3. The defendant was convicted of "aggravated fleeing or attempting to elude a peace officer" in violation of 625 Ill. Comp. Stat. Ann. 5/11-204(a) (2004), which provides in part, "Any driver or operator of a motor vehicle who, having been given a visual or audible signal by a peace officer directing such driver or operator to bring his vehicle to stop, willfully fails or refuses to obey . . . is guilty of a . . . misdemeanor" if, among other essential elements, the peace officer is in uniform. *Williams*, 2015 IL App (1st) 133582, ¶¶ 6-8, 11. Because the evidence established that the officer was in "civilian dress" when he attempted to apprehend the defendant, the court concluded that "there can be no doubt that the [s]tate failed to prove an essential element [of fleeing a peace officer], namely, that of the officer being in uniform." *Id.* ¶ 15.

**{35}**   The State argues that the Court of Appeals reliance on a definition of "uniform" in *Webster's Third New International Dictionary* 2498 (unabr. ed. 1986) fails to support the Court's own conclusion that a badge, by itself, is not a uniform. Specifically, the State asserts that to define a uniform as "'clothing and accessories' of a 'distinctive design . . . serving as a means of identification'" does not mean "that the clothing alone must be distinctive." The State asserts instead that the definition means "the clothing and accessories must be distinctive *when considered together*." In other words, the State asserts that even under the Court of Appeals definition of uniform, Deputy Russ's dress "need not be the sole, or even primary means" of identifying him as a police officer. We reject the State's alternative construction.

**{36}**   Defining the word uniform, as the Court of Appeals did, to mean "*dress* of a *distinctive design* . . . serving as a means of identification," *Montano*, 2018-NMCA-047,

¶ 11 (citation omitted), is significant in two ways. First, because "[d]ress" means "clothing *and* accessories[,]" in order to qualify as a uniform, an individual's attire must be composed of both clothing and accessories. *See id.* (citation omitted). The conjunctive use of "'and'" in a statute "requires an interpretation that [all] elements . . . must be present." *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 14, 112 N.M. 97, 811 P.2d 1308. Second, from a purely grammatical perspective, "of a distinctive design" modifies "dress" for purposes of what constitutes a uniform. Therefore, both the clothing and the accessories that constitute an individual's dress must be of a "distinctive design" that serves "as a means of identification" in order to stand as a uniform. *See Garcia v. Schneider, Inc.*, 1986-NMCA-127, ¶ 9, 105 N.M. 234, 731 P.2d 377 ("Statutes must be read according to their grammatical sense.").

{37}   In the context of Section 30-22-1.1(A), both the clothing and accessories worn by a law enforcement officer must be of a "distinctive design" that serves to identify the individual wearing them as a law enforcement officer. It follows that a badge alone——which undoubtedly constitutes an accessory that serves, in part, to identify the individual wearing it as a law enforcement officer——is not sufficient to constitute a uniform without distinctive clothing identifying the wearer as a law enforcement officer. We therefore reject the State's argument that under the Court of Appeals definition of uniform, an officer's clothing and accessories need to be distinctive only "*when considered together.*"

{38}   We therefore conclude that Deputy Russ's attire which included "a dress shirt with tie, dress slacks, and dress shoes" was not a uniform as required by Section 30-22-1.1(A). His clothing—professional attire—did not in any way distinguish Deputy Russ as a law enforcement officer. Moreover, while a police officer's badge is a distinctive accessory that identifies a police officer, it is not, standing alone, a uniform. We are particularly persuaded by the fact that in the 1968 change to Section 66-8-124 the Legislature could have used the definition "badge or uniform" but it did not. Instead, it deleted "badge" and used "uniform." We affirm the Court of Appeals conclusion that Defendant Montano's conviction for aggravated fleeing a law enforcement officer must be reversed because Deputy Russ was not in uniform at the time he attempted to stop Defendant Montano.

## IV.   APPROPRIATELY MARKED LAW ENFORCEMENT VEHICLE

{39}   Defendant Martinez argues that the Court of Appeals interpretation of "appropriately marked law enforcement vehicle" in *Montano*, 2018-NMCA-047, was flawed in view of the plain meaning of Section 30-22-1.1. Specifically, Defendant Martinez asserts that principles of statutory construction "substantiate that the Legislature meant for 'appropriately marked law enforcement vehicle' to require lettering, decals, insignia, and coloring clearly identifying the vehicle as a law enforcement vehicle." Defendant Martinez accordingly contends that, in applying its reasoning from *Montano*, the Court of Appeals erred in concluding that Deputy Gilbert's unmarked tan Ford Explorer was an "appropriately marked law enforcement vehicle" under the statute prohibiting aggravated fleeing a law enforcement officer. The State

responds by asserting that the Court of Appeals was correct in concluding that Deputy Gilbert's Ford Explorer was an "appropriately marked law enforcement vehicle" considering the plain meaning of that term, the legislative purpose of Section 30-22-1.1(A), and the rules of statutory construction. We agree with Defendant Martinez.

## A.      Court of Appeals Opinion

**{40}**      To reiterate, the district court ruled that Deputy Gilbert was not in an "appropriately marked law enforcement vehicle" when he attempted to stop Defendant Martinez. Deputy Gilbert was driving a tan colored Ford Explorer, an "unmarked patrol vehicle" used in covert operations to evade detection. "By design, the vehicle bore no insignias, stripes, decals, labels, seals, symbols, or other pictorial signs or lettering indicating its identity as a law enforcement vehicle." However, Deputy Gilbert's vehicle was equipped with red and blue LED lights within the grill area that were visible through the grill even when not activated, as well as a siren with speakers inside the grill, and an antenna not common to "civilian" vehicles. The Court of Appeals summarily reversed the district court ruling based on its holding in *Montano* that the vehicle Deputy Russ drove in pursuit of Defendant Montano was an "appropriately marked law enforcement vehicle." *Martinez*, A-1-CA-35111, mem. op. ¶¶ 1-2. In *Montano*, Deputy Russ "was driving a Ford Expedition that had no decals, striping, insignia, or lettering" anywhere on the vehicle. 2018-NMCA-047, ¶ 2. However, "[his] vehicle had wigwag headlights, red and blue flashing lights mounted on the front grill and the top rear window, flashing brake lights, and a siren." *Id.* We must address the opinion in *Montano* in order to resolve the issue brought before us by Defendant Martinez.

**{41}**      In *Montano* the Court of Appeals began its analysis of whether an unmarked police car may constitute an "'appropriately marked' law enforcement vehicle" by looking to the plain meaning of "appropriately marked." 2018-NMCA-047, ¶¶ 35-36. Using *Webster's Third New International Dictionary* 1382 (unabr. ed. 1986), the Court of Appeals observed that "mark" may be defined as "something that gives evidence of something else" or "a character, *device*, label, brand, seal, or other sign put on an article esp[ecially] to show the maker or owner, to certify quality, or for identification." *Montano*, 2018-NMCA-047, ¶ 36 (alteration in original) (internal quotation marks omitted). Based on these definitions the Court of Appeals stated, "In the context of Section 30-22-1.1(A), we understand the plain meaning of 'appropriately marked' to be that the vehicle in question is marked in a manner that is suitable for being driven by a law enforcement officer and identified as such." *Montano*, 2018-NMCA-047, ¶ 37. The Court of Appeals considered it "significant that the Legislature did not specifically refer to insignia or lettering, and instead used only the broader term, 'mark.'" *Id.* The Court of Appeals said that the emergency lights and the siren on Deputy Russ's vehicle are devices that evidence and otherwise identify Deputy Russ's Ford Expedition as a law enforcement vehicle. *Id.* As such, the Court of Appeals concluded, Deputy Russ's vehicle was "appropriately marked" as required by Section 30-22-1.1(A). *Montano*, 2018-NMCA-047, ¶ 37.

**{42}**     The Court of Appeals also recognized that a "marked" police vehicle "commonly refers to a vehicle with lettering, insignia, or striped paint that would indicate the driver of the vehicle is a law enforcement officer" and that an "unmarked" police vehicle "refers to a vehicle without any such graphic markings on the exterior." *Id.* ¶ 38. Thus, the Court of Appeals concluded that the phrase "appropriately marked" is ambiguous and cited this ambiguity as a basis for *not* applying the plain meaning of the words. *Id.* ¶ 39. The Court of Appeals therefore looked to legislative intent as an alternative for determining what "[appropriately] marked law enforcement vehicle" means under Section 30-22-1.1(A). *Montano*, 2018-NMCA-047, ¶¶ 39-40.

**{43}**     The Court of Appeals concluded that "the intent of Section 30-22-1.1(A)'s requirement that the police vehicle be 'appropriately marked' is . . . to establish that the motorist knows that he is fleeing a law enforcement officer." *Montano*, 2018-NMCA-047, ¶ 40. The Court of Appeals then referred to the version of NMSA 1978, Section 66-7-332(A) (2005) applicable to Defendant Montano's conviction:

> Upon the immediate approach of an authorized emergency vehicle displaying flashing emergency lights or when the driver is giving audible signal by siren, exhaust whistle or bell, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection and shall stop and remain in that position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.

*See Montano*, 2018-NMCA-047, ¶ 19. Based on this statutory language, the Court of Appeals stated, "[A] motorist who sees a vehicle with flashing emergency lights and/or hears its sirens must pull off the road and stop." *Id.* ¶ 42. "[W]hether the motorist can differentiate a police vehicle from, say, an ambulance is of no consequence for purposes of establishing the initial obligation to stop." *Id.* "Stated another way, a law enforcement vehicle is 'appropriately marked' so long as it has sufficient equipment to trigger the motorist's obligation under Section 66-7-332 [(2005)] to come to a stop." *Montano*, 2018-NMCA-047, ¶ 42. Based on this rationale, the Court of Appeals concluded that "a vehicle equipped with emergency lights, flashing lights, and siren, i.e., one consistent with the plain meaning of 'appropriately marked,' also meets the legislative intent underlying Section 30-22-1.1(A)." *Montano*, 2018-NMCA-047, ¶ 42. Therefore, the Court of Appeals concluded, "the siren along with the combination of flashing and alternating lights on [Deputy] Russ's vehicle were sufficient to enable Defendant [Montano] to know immediately, not only that it was an emergency vehicle, but that it was a law enforcement vehicle in particular." *Id.* ¶ 43.

**{44}**     Finally, the Court of Appeals considered whether its conclusion that the siren and combination of flashing and alternating lights, with which Deputy Russ's Ford Expedition was equipped, satisfied the "appropriately marked" requirement of the aggravated fleeing statute, thereby rendering the additional language in the statute surplusage and meaningless contrary to the canons of statutory construction. *Montano*, 2018-NMCA-

047, ¶ 44. To reiterate once again, Section 30-22-1.1(A) requires not only that the pursuing law enforcement officer be "in an appropriately marked law enforcement vehicle" but also that the perpetrator be driving in a reckless manner that is a danger to the life of another "after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal" by the officer.

**{45}** In a brief analysis of this question, the Court of Appeals concluded that its construction of the statute did not render another portion of the statute superfluous. *Montano*, 2018-NMCA-047, ¶ 45. The Court of Appeals gave three reasons in support of its conclusion. First, the Court of Appeals stated that the "visual or audible signal to stop" required by Section 30-22-1.1(A) "may be given by any number of means, including hand or voice," and "[t]hus, the flashing lights and/or siren that satisfy the appropriately marked vehicle element will not necessarily be the, or at least the only, visual or audible signal to stop that the officer gives." *Montano*, 2018-NMCA-047, ¶ 45. Second, the Court of Appeals stated that because Section 30-22-1.1(A) sets out examples of the visual or audible signal to stop in the disjunctive (i.e., "hand, voice, emergency light, flashing light, siren or other signal"), not all of the equipment activated by Deputy Russ during his pursuit of Defendant Montano (i.e., "siren, flashing red and blue lights, *and* wigwag lights") was required to signal Defendant Montano to stop. *Montano*, 2018-NMCA-047, ¶ 45. Third, the Court of Appeals stated that the same evidence may be used to satisfy both requirements of Section 30-22-1.1(A): the "visual or audible signal to stop" and the "appropriately marked law enforcement vehicle." *Montano*, 2018-NMCA-047, ¶ 45. The Court of Appeals relied on the dissenting opinion in *People v. Hudson*, 136 P.3d 168, 177 (Cal. 2006) for this proposition, in which Justice Moreno wrote that "the requirement that a police vehicle must be distinctively marked can be satisfied, in part, by the same evidence used to establish the additional requirements that the vehicle exhibit a red lamp that is visible from the front and that the suspect reasonably should have seen, and sound a siren as reasonably necessary." *See Montano*, 2018-NMCA-047, ¶ 45.

**{46}** As an aside, the Court of Appeals concluded its discussion by stating that it was "sensitive to the public concern expressed . . . about persons posing as law enforcement officers in vehicles equipped with emergency lights and sirens who stop and prey upon other motorists." *Id.* ¶ 46. The Court of Appeals added that it has "no evidence that this consideration entered into the motivation of any of the members of our Legislature in enacting Section 30-22-1.1[, and f]or this reason, it does not inform our construction of Section 30-22-1.1(A)." *Montano*, 2018-NMCA-047, ¶ 46.

## B. Analysis

**{47}** "[I]t is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352. Judicial responsibility compels our conclusion that the Court of Appeals analysis of Section 30-22-1.1(A) is flawed in three ways: (1) While defining the statutory term "mark," the analysis fails to fully appreciate the significance of "appropriate" in the statutory element

"appropriately marked law enforcement vehicle," (2) the analytical resolution of ambiguity in the statutory phrase "appropriately marked" is overbroad in light of the import of related statutes in the Motor Vehicle Code, and (3) the analysis renders statutory language surplusage and meaningless in violation of canons of statutory construction. We consider each of these flaws in turn, in light of the weight of authority in other jurisdictions.

## 1. Plain meaning of "appropriately marked"

**{48}** In considering the plain meaning of "appropriately marked," the Court of Appeals focused on "mark" as "something that gives evidence of something else" or "a character, device, label, brand, seal, or other sign put on an article esp[ecially] to show the maker or owner, to certify quality, or for identification." *Montano*, 2018-NMCA-047, ¶ 36 (alteration in original) (emphasis omitted) (internal quotation marks and citation omitted). Acknowledging that an "appropriately marked" law enforcement vehicle means "the vehicle in question is marked in a manner that is suitable for being driven by a law enforcement officer and identified as such," *id.* ¶ 37, the Court of Appeals glossed over the significance of "appropriate" as a statutory element of Section 30-22-1.1(A).

**{49}** *Webster's Third New International Dictionary* 106 (unabr. ed. 1986) states that "appropriate" means "specially suitable" including "specially suitable to [a] use." It follows that a plain meaning construction of "appropriately marked law enforcement vehicle" contemplates that such a vehicle must bear "a character, device, label, brand, seal, or other sign" that not only makes it suitable to be driven by a law enforcement officer, but also that sets it apart as specially suitable to law enforcement use. *See id.* at 106, 1382. As discussed further below, even assuming that a siren and lights constitute devices that fall into the category of markings, such markings alone are insufficient to set apart a vehicle as specially suitable to law enforcement use and therefore do not satisfy the requirement of Section 30-22-1.1(A) that a pursuing officer under the statute be in an "appropriately marked law enforcement vehicle." Instead, as Defendant Martinez argues in his brief, in order to be set apart as specially suitable to law enforcement use, a police vehicle must bear decals or other prominent and highly visible insignia that identify for the public the vehicles that are in fact "law enforcement vehicles used in police pursuits."

## 2. Ambiguity in the Court of Appeals construction of "appropriately marked"

**{50}** The Court of Appeals acknowledged the patent ambiguity in its construction of "appropriately marked" as including Deputy Russ's Ford Expedition that bore no decals, striping, insignia, or lettering anywhere on the vehicle. *See Montano*, 2018-NMCA-047, ¶¶ 38-43. In its attempt to resolve the ambiguity, the Court of Appeals looked to the legislative intent of Section 30-22-1.1(A) and read the aggravated fleeing statute in conjunction with Section 66-7-332(A) (2005) to conclude that "the siren along with the combination of flashing and alternating lights on [Deputy] Russ's vehicle were sufficient to enable Defendant [Montano] to know immediately, not only that it was an emergency

vehicle, but that it was a law enforcement vehicle in particular." *Montano*, 2018-NMCA-047, ¶¶ 42-43.

**{51}** Defendant Martinez asserts that the Court of Appeals analysis is contrary to the "history, background, structure of the statute, and its interplay with other [related] statutes" aimed at effectuating the Legislature's goal of making police vehicles engaged in pursuits highly visible to both defendants and to the general public—"a goal which is best served by interpreting 'appropriately marked law enforcement vehicle' in accordance with its commonly understood meaning" under Section 30-22-1.1(A). We agree.

**{52}** The Court of Appeals relied heavily on Section 66-7-332(A) (2005) for the proposition that "a motorist who sees a vehicle with flashing emergency lights and/or hears its siren must pull off the road and stop" and that "a vehicle equipped with emergency lights, flashing lights, and siren, i.e., one consistent with the plain meaning of 'appropriately marked,' also meets the legislative intent underlying Section 30-22-1.1(A)" of ensuring that defendants understand that they are fleeing a law enforcement officer. *Montano*, 2018-NMCA-047, ¶¶ 40, 42.

**{53}** The Court of Appeals analysis of the legislative intent of Section 30-22-1.1(A) that includes Section 66-7-332 (2005) is overbroad and therefore flawed. Section 66-7-332(A) (2005) requires all drivers to pull over and stop "[u]pon the immediate approach of an authorized emergency vehicle displaying flashing emergency lights or when the driver is giving audible signal by siren[.]" An "authorized emergency vehicle" is in turn defined as "any fire department vehicle, police vehicle and ambulance and any emergency vehicles of municipal departments or public utilities that are designated or authorized as emergency vehicles by the director of the New Mexico state police division of the department of public safety or local authorities." NMSA 1978, § 66-1-4.1(F) (2017). The obvious purpose of these statutes is to require traffic to pull over to allow an emergency vehicle to attend to its emergency call as quickly and safely as possible. Once the emergency vehicle passes, traffic can resume moving. This does not compare to a police officer's nonconsensual traffic stop of a single driver based on reasonable suspicion or probable cause of a crime. Emergency vehicles such as fire trucks and ambulances are easily identifiable and not outfitted to avoid detection. Additionally, pursuant to NMSA 1978, Section 66-3-835(C) (2019), [f]lashing lights are prohibited except . . . on authorized emergency vehicles, school buses, snow-removal equipment and highway-marking equipment."

**{54}** Even assuming that it is reasonable for members of the public to infer that all vehicles equipped with flashing lights alone or flashing lights and a siren are "authorized emergency vehicles," there is no basis for a member of the public to infer from the same characteristics that such a vehicle must be a law enforcement vehicle. *See* D'Val Westphal, *Rainbow of flashing vehicle lights confusing, Albuquerque J.*, July 16, 2018, https://www.abqjournal.com/1197014/rainbow-of-flashing-vehicle-lights-confusing.html (last visited February 3, 2020) (discussing the confusion of the public concerning what

vehicles and departments/organizations can use which type of vehicle lights and how a driver should respond based on the myriad of vehicles that currently use flashing lights).

**{55}** Deputy Russ's unmarked tan Ford Expedition may be unmarked for good reasons, including the ability to conduct covert investigations while avoiding detection by the public and, more importantly, by those being investigated. The stealthy functioning of Deputy Russ's vehicle is admittedly different than the functioning of the marked vehicles used by police who conduct regular traffic stops and interact with the public on a regular basis. Reiterating the definition of "mark" as that which provides identification, we cannot conclude that lights or a siren are unique in identifying a police officer's vehicle where emergency vehicles, tow trucks, and even civilian vehicles may be equipped with these same signaling devices.

**{56}** Rather, in accordance with the plain meaning of the phrase "appropriately marked," the only meaningful way to set apart a law enforcement vehicle as specially suitable for police use, and in so doing to ensure that members of the public understand in a given situation that they are being pursued by a law enforcement officer, is to construe "appropriately marked law enforcement vehicle" for purposes of Section 30-22-1.1(A) to mean a police vehicle bearing decals or other prominent and visible insignia identifying it as such. The weight of authority in other jurisdictions supports this conclusion, as described later in this analysis.

### 3. Surplusage in Section 30-22-1.1(A) resulting from the Court of Appeals construction of the statute

**{57}** Finally, the Court of Appeals concluded that its interpretation of Section 30-22-1.1(A) does not render language in the statute surplusage or otherwise meaningless. *Montano*, 2018-NMCA-047, ¶¶ 44-45. Defendant Martinez argues that "the Court of Appeals interpretation conflates distinct requirements . . . in violation of well-established canons of statutory construction." Specifically, Defendant Martinez asserts, "If all the Legislature had meant to require was flashing lights and a siren, then there would have been no need to describe the vehicle itself as 'appropriately marked' and then separately require a stop signal using lights and a siren." We agree.

**{58}** In support of its conclusion, as noted previously the Court of Appeals relied on the dissent in *Hudson*, 136 P.3d at 177, in which Justice Moreno wrote that "the requirement that a police vehicle must be distinctively marked can be satisfied, in part, by the same evidence used to establish the additional requirements that the vehicle exhibit a red lamp that is visible from the front and that the suspect reasonably should have seen, and sound a siren as reasonably necessary." Because this was neither the majority view of the California Supreme Court nor a position consistent with the view any other case addressing the issue has taken, we are unpersuaded. To the contrary, the opposite conclusion was reached by the Court of Appeals of Maryland in *Williams v. State*, 24 A.3d 210, 233-34 (Md. Ct. Spec. App. 2011) (concluding that an unmarked police car equipped with only lights and sirens did not constitute an appropriately marked police vehicle within the meaning of the state statute that prohibits "attempting

to elude a police officer" because reading the statute to permit an officer's activation of lights and sirens to satisfy the requirement that the officer give a visual or audible signal to stop and also the requirement that the officer be in an appropriately marked police vehicle would render the language requiring the marking of a police vehicle superfluous and meaningless (citation omitted)).

**{59}** Nor are we persuaded by the Court of Appeals alternatively stated rationale in support of its conclusion: (1) Flashing lights and a siren may not be the police officer's only visual signal to stop or (2) not all of the equipment Deputy Russ activated during his pursuit of Defendant Montano (i.e., siren, flashing red and blue lights, and wigwag headlights) was required to signal Defendant Montano to stop. *See Montano*, 2018-NMCA-047, ¶ 45. Simply put, if under the plain meaning of "appropriately marked," lights and a siren do not set a vehicle apart as specially suitable law for law enforcement use, such equipment in any combination can in no case stand as evidence of appropriate markings for a law enforcement vehicle for purposes of Section 30-22-1.1(A). Any construction to the contrary renders essential language in the aggravated fleeing statute surplusage and otherwise meaningless.

### 4. The law in other jurisdictions

**{60}** For all the foregoing reasons, we conclude that the Court of Appeals erred in its conclusion in *Montano* that the vehicle driven by Deputy Russ was an "appropriately marked law enforcement vehicle." The weight of authority from other states gives added support to our conclusion.

**{61}** Under a 1983 version of Washington law, the crime of eluding a police officer required, in part, that the officer the perpetrator was eluding be in a "vehicle [that] shall be appropriately marked showing it to be an official police vehicle." Wash. Rev. Code Ann. § 46.61.024(1) (1983, amended 2003, 2010); *see State v. Argueta*, 27 P.3d 242, 244 & n.3 (Wash. Ct. App. 2001). Construing the language in the statute prohibiting attempts to elude a police officer, the Court of Appeals of Washington concluded that emergency equipment was insufficient "to render a police vehicle appropriately marked for purposes of the eluding statute." *Argueta*, 27 P.3d at 245-46. The court reasoned that based on the plain meaning of the dictionary definitions of "appropriate" and "mark"——which respectively mean "specially suitable" and "a character, device, label, brand, seal, or other sign put on an article esp. to show the maker or owner, to certify quality, or for identification"——"[e]mergency equipment is a signaling device, not an identifying device." *Id.* at 245 & ns.11-14 (internal quotation marks omitted) (quoting *Webster's Third New International Dictionary* 106, 1382-83 (unabr. ed. 1993)). The court continued that

> we must assume that the [l]egislature intended to require something more than the presence of activated emergency equipment in order to render a police vehicle appropriately marked for purposes of the eluding statute. That "something more" the [l]egislature required is a "mark," which, under

the ordinary meaning of the term, means an insignia identifying the vehicle as an official police vehicle.

*Argueta*, 27 P.3d at 245-46.

**{62}**    Other states, including Louisiana, Maryland, North Dakota, Pennsylvania, Wisconsin, and California have reached similar conclusions construing their fleeing and eluding a police officer statutes. *See State v. Harris*, 261 So. 3d 149, 154-56 (La. Ct. App. 2018) (determining under the Louisiana statute criminalizing flight from an officer, which requires the use of a marked police vehicle, that a police car equipped with emergency lights, a siren, and spotlights but no other marking or insignia did not constitute a marked police vehicle); *Williams*, 24 A.3d at 234) (concluding that an unmarked police car equipped with only lights and sirens did not constitute an appropriately marked police vehicle within the meaning of the Maryland statute prohibiting knowing failure to stop a vehicle when signaled by a police officer in an appropriately marked police vehicle because "[r]eading the statute to permit an officer's activation of lights and sirens to satisfy [both] the requirement that the officer give a visual or audible signal to stop and the requirement that the officer be in" an appropriately marked police vehicle would render the language requiring the marking of a police vehicle superfluous and meaningless); *State v. Erdman*, 422 N.W.2d 808, 809-10 (N.D. 1988) (concluding that the defendant, pursued by plain-clothed officers driving unmarked vehicles, could not be convicted of fleeing or attempting to elude police officers for willfully refusing to stop a vehicle under the North Dakota statute that required uniformed officers driving official marked police vehicles); *Commonwealth. v. Durrett King*, 195 A.3d 255, 262 (Pa. 2018) (determining, for purposes of the Pennsylvania statute prohibiting attempts to elude a pursuing police vehicle, that the term "markings" does not include the lights and siren on a police car and only includes the "graphics or decals identifying the department or agency of the vehicle"); *State v. Opperman*, 456 N.W.2d 625, 626-28 (Wis. Ct. App. 1990) (concluding that a police vehicle equipped with only red lights and a siren and no police department insignia or decals was not a "marked police vehicle" for purposes of the Wisconsin statute prohibiting a knowing attempt to elude or flee a police officer in a marked police vehicle, notwithstanding that the defendant accelerated his vehicle when he saw the vehicle with red lights engaged); *see also Hudson*, 136 P.3d at 175 (stating that in order to establish that a police vehicle is distinctively marked for purposes of the California statute that prohibits willful fleeing or attempting to a elude a police officer's motor vehicle, "a pursuing police vehicle must have distinguishing features *in addition to* a red light and siren").

**{63}**    Additionally, the Indiana Court of Appeals acknowledged the importance of police officer recognition in protecting the public from police impersonators. In doing so, it cited its statute requiring an officer to be "(1) wearing a distinctive uniform and a badge of authority; or (2) operating a motor vehicle that is clearly marked as a police vehicle[] that will clearly show the officer or the officer's vehicle to casual observations to be an officer or a police vehicle[.]" *Ervin v. State*, 968 N.E.2d 315, 318 (Ind. Ct. App. 2012). "The statute seeks to help distinguish law enforcement officers from those individuals on our

highways who, for illicit purposes, impersonate law enforcement officers." *Id.* (citing *Maynard v. State*, 859 N.E.2d 1272, 1274 (Ind. Ct. App. 2007)).

**{64}**   A minority of jurisdictions, including Kansas, Massachusetts, and Ohio have reached the opposite conclusion concerning whether lights and a siren on an otherwise unmarked police vehicle are sufficient markings for purposes of those state statutes that prohibit fleeing and eluding a law enforcement officer. *See State v. Parker*, 430 P.3d 975, 984 (Kan. 2018); *Commonwealth v. Ross*, 896 N.E.2d 647, 649-50 (Mass. App. Ct. 2008); *State v. Bradley*, 55 N.E.3d 580, 584-85 (Ohio Ct. App. 2015). We do not find this minority of cases persuasive.

## 5.   Result

**{65}**   Applying the foregoing analysis to the facts in the case of Defendant Martinez, we hold that the district court correctly concluded that the vehicle Deputy Gilbert was driving when he attempted to stop Defendant Martinez was not "an appropriately marked law enforcement vehicle" as required by Section 30-22.1.1(A). Deputy Gilbert himself described that vehicle as "my unmarked patrol vehicle." The vehicle "bore no insignias, stripes, decals, labels, seals, symbols or other pictorial signs or lettering indicating its identity as a law enforcement vehicle." While the vehicle was equipped with "red and blue LED lights located within the grill area that were visible through the grill even when not activated" and had a siren with speakers located inside the grill, as well as "an antenna that is not common to civilian vehicles," there is nothing distinctive about this equipment to identify the vehicle as a police vehicle.

**{66}**   Without more, like the Ford Expedition Deputy Russ drove in *Montano*, the lights, siren, and antenna that equipped Deputy Gilbert's Ford Explorer were insufficient to constitute appropriate markings indicating to the public that the vehicle was in fact a law enforcement vehicle in accordance with the plain meaning of the statute and legislative intent underlying Section 30-22-1.1(A). Moreover, activating the red and blue LED lights and siren located within the grill of a vehicle that has no insignias, stripes, decals, labels, seals, symbols, or other signs or lettering identifying the vehicle as a law enforcement vehicle does not automatically transform an unmarked police vehicle into a marked police vehicle. Because Deputy Gilbert's vehicle was not appropriately marked, we conclude that the Court of Appeals erred in reversing the district court dismissal of his aggravated fleeing charge.

## V.   CONCLUSION

**{67}**   We affirm the holding of the Court of Appeals in *Montano* in part, and we reverse in part. Specifically, we affirm the holding that Deputy Russ was not "a uniformed law enforcement officer" as required by Section 30-22-1.1(A), and we reverse the holding that Deputy Russ was "in an appropriately marked law enforcement vehicle" as required by Section 30-22-1.1(A). In accordance with this holding and the statute, we also reverse the Court of Appeals holding in *Martinez* that Deputy Gilbert was "in an appropriately marked law enforcement vehicle."

**{68}    IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**

**NAKAMURA, Chief Justice (dissenting).**

**{69}**    Imagine a driver looks in his side mirror as he approaches a stop sign and recognizes, behind him, a law enforcement officer whom the driver personally knows. The driver then rolls through the stop sign and takes off.  When the driver takes off, the officer engages his vehicle's red and blue lights and siren, signaling the driver to stop. Instead of pulling over, the driver continues to speed away, revving his engine and taking wide turns at intersections, locking up his brakes. There are many other vehicles on the road, including one with a child in an infant seat, and several bystanders.  The officer pursues the driver, but ultimately abandons the chase as too dangerous.  Later, the driver is arrested for aggravated fleeing.  These are the facts in Defendant Martinez's case.

**{70}**    The majority holds that Defendant Martinez is not criminally liable for aggravated fleeing under these circumstances, because the pursuing officer's vehicle did not bear "decals or other prominent and visible insignia," *Maj. op.* ¶ 56, and was therefore not "appropriately marked" within the meaning of the statute.  Similarly, in the companion case of Defendant Montano, the majority holds that a prominently displayed badge, together with professional attire, is not a "uniform" within the meaning of the statute, because a uniform must include *clothing* of a distinctive design.  *Maj. op.* ¶¶ 37-38. Thus, the majority treats an officer's appropriately marked vehicle and uniform as elements of the crime of aggravated fleeing, and relies primarily upon dictionary and technical regulatory definitions to interpret those elements.  In doing so, the majority places some defendants who know that their pursuer is law enforcement—a defendant like Martinez—beyond the reach of the aggravated fleeing statute.

**{71}**    I respectfully dissent.  The terms at issue are not standalone elements of the crime of aggravated fleeing; rather, they are identifying factors bearing on the defendant's knowledge that he is evading law enforcement.  I would therefore adopt a test similar to the test established by the Court of Appeals in *Archuleta*, 1994-NMCA-072, ¶ 11: namely, that a jury may find the knowledge element of the statute to be satisfied where an officer's uniform, vehicle, and other circumstances surrounding the interaction between the officer and the defendant are sufficient to notify a reasonable person that he has been signaled to stop by law enforcement.  A jury may also consider

evidence of a defendant's subjective knowledge that his pursuer was police. Explained in further detail below is why the construction I propose (1) is contextual; (2) furthers, rather than compromises the intent of the legislature to protect the public from drivers who knowingly and recklessly evade law enforcement; and (3) is consistent with our interpretation of other statutory uses of similar terms. Next, explained under this standard, is why I would affirm Defendant Montano's conviction and remand Defendant Martinez's case for further proceedings consistent with this dissent.

## I.    CONTEXTUAL INTERPRETATION

**{72}**    "[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used[.]"  *Yates v. United States*, 574 U.S. 528, 537 (2015) (internal quotation marks and citation omitted).  Context may, and often does, explain why dictionary definitions are plainly inapplicable.  *Id.*; *accord Cummings v. X-Ray Assocs.*, 1996-NMSC-035, ¶ 45, 121 N.M. 821, 918 P.2d 1321.  Here, the statutory context of the terms before us is as follows:

> A.    Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act [LESPA] [NMSA 1978, § 29-20-1 to -4 (2003)].

Section 30-22-1.1(A).  We previously interpreted this language to require proof of the defendant's knowledge that (1) a person who is a law enforcement officer, as designated by his uniform and marked vehicle, (2) signaled the defendant to stop. *Padilla*, 2008-NMSC-006, ¶ 15, 143 N.M. 31, 176 P.3d 299.  We described the officer's uniform and appropriately marked car as part of the "backdrop" against which the defendant's knowledge is evaluated.  *Id.* ¶ 15.  In my view, this context supports an interpretation of "uniform" and "appropriately marked" not as elements of the crime, but as descriptions bearing on an attendant circumstance in the statute—namely, the pursuer's identity.

**{73}**    An attendant circumstance is "[a] fact that is situationally relevant to a particular event or occurrence."  Circumstance, *Black's Law Dictionary* (11th ed. 2019).  "A fact-finder often reviews the attendant circumstances of a crime to learn, for example, the perpetrator's motive or intent."  *Id.*  Our appellate courts have addressed attendant circumstances in the context of a crime with significant similarities to aggravated fleeing: aggravated battery upon a peace officer.  NMSA 1978, § 30-22-25 (1971).  Aggravated battery upon a peace officer is defined as "the unlawful touching or application of force to the person of a peace officer with intent to injure that peace officer while he is in the lawful discharge of his duties."  Section 30-22-25(A).  Examining this provision, the

Court of Appeals held that a "requirement of knowledge attaches to the attendant circumstance of the victim's status as a peace officer." *State v. Nozie*, 2007-NMCA-131, ¶ 11, 142 N.M. 626, 168 P.3d 756, *aff'd*, 2009-NMSC-018, ¶ 11, 146 N.M. 142, 207 P.3d 1119. This Court agreed, explaining that our "Legislature intended knowledge of the victim's identity as a peace officer to be an essential element of the crime." *Nozie*, 2009-NMSC-018, ¶ 30. However, we emphasized that "it is the defendant's mental state, rather than the victim's conduct, that is the touchstone of the knowledge requirement." *Id.* ¶ 32. We also noted that "[b]ecause an individual's intent is seldom subject to proof by direct evidence, intent may be proved by circumstantial evidence." *Id.* (alteration in original) (citation omitted). We explained that "[s]uch circumstantial evidence may include, but is not limited to, the fact that the victim was in full uniform, had a badge visibly displayed, was driving a marked police vehicle, or had identified himself or herself as a peace officer." *Id.* In other words, the defendant's intent must be discerned from the totality of the circumstances bearing on the victim's identity as a peace officer.

**{74}**    Aggravated fleeing likewise requires proof of an *act toward an officer* (fleeing) as an attendant circumstance, and the knowledge requirement of the statute carries over to that circumstance. *Padilla*, 2008-NMSC-006, ¶ 15-16. Uniforms and appropriately marked cars are obvious identifiers of law enforcement, and thus their inclusion in the statute is unsurprising, particularly because the statute specifically addresses reckless evasion by vehicle. However, that is no reason to treat these identifiers as elements of the crime, much less to define them strictly. Rather, as in the aggravated battery context, the defendant's mental state—not the officer's conduct or even appearance—must be the touchstone of the knowledge requirement. *See id.* ¶ 11 ("Criminal liability is typically defined by the conduct of the accused, not the conduct of the police officer or the law enforcement agency tasked to enforce the criminal code.").

## II.    LEGISLATIVE INTENT AND AVOIDING ABSURD RESULTS

**{75}**    Legislative intent, the lodestar of statutory construction, *State v. Chavez*, 1966-NMSC-217, ¶ 7, 77 N.M. 79, 419 P.2d 456, also favors the pragmatic framework proposed in this dissent. The purpose of the aggravated fleeing statute is to avoid the public hazard created by drivers who knowingly and recklessly evade law enforcement. *Padilla*, 2008-NMSC-006, ¶ 21 ("The statute appears to be designed to protect the general public from the dangers of a high speed chase."); *see* Aaron Baca, *State v. Padilla: An Aggravated Reading of the State's Aggravated Fleeing a Police Officer Statute*, 39 N.M. L. Rev. 485, 488 (2009) (citing Leslie Linthicum, *Wrong Place, Wrong Time*, Albuquerque J., Sept. 9, 2001, at A1 and David Miles, *Bill Beefs Up Penalties for Fleeing From Officers*, Albuquerque J., Feb. 15, 2002, at A10) (discussing that, two years before the aggravated fleeing statute's enactment, six people were killed in traffic accidents caused by defendants fleeing officers). In *State v. Vest*, 2018-NMCA-060, ¶ 8, 428 P.3d 287, *cert. granted* (S-1-SC-37210, Sept. 24, 2018), the Court of Appeals noted that, upon passing the aggravated fleeing statute, a fourth-degree felony, the Legislature nevertheless retained, as a misdemeanor offense, the statute criminalizing resisting, evading, or obstructing an officer, including vehicular flight from an officer, in

Section 30-22-1. The State is required to prove, under any of the subsections in the misdemeanor statute, that the defendant took some resistive, evasive, or obstructive action knowing that the person resisted, evaded, or obstructed was an officer. *See State v. Jimenez*, 2017-NMCA-039, ¶ 28, 392 P.3d 668 (citing UJI 14-2215 NMRA). What distinguishes *aggravated* fleeing from other forms of evading or obstructing law enforcement is, then, the "legislative intent to more severely punish people who jeopardize the safety of others while fleeing from law enforcement officers." *Vest*, 2018-NMCA-060, ¶ 8

**{76}** Given this purpose, it is difficult to conceive that the Legislature intended only defendants pursued by vehicles with decals or insignias and officers in sufficiently distinctive clothing to come within the ambit of the aggravated fleeing statute, especially where—as in Defendant Martinez's case—there is evidence of the defendant's subjective knowledge that he was being pursued by police. Nor do I think Defendant Martinez's case is an isolated one. Many of our citizens live in "small towns where everyone knows the constable and recognizes his official status." *Archuleta*, 1994-NMCA-072, ¶ 11. Even in larger counties, drivers may recognize officers with whom they have had past encounters. I also note that, while the statute provides that any pursuit which may form the basis of an aggravated fleeing charge shall be "in accordance with the provisions of the [LESPA]," Section 30-22-1.1(A), the LESPA does not contemplate that only officers in vehicles with prominent insignias, logos, or decals will engage in high-speed pursuits of those evading law enforcement. The statute simply states that an "authorized emergency vehicle," may engage in such pursuit, Section 29-20-2, and the guidelines for pursuit policies make no provision for use of a particular law enforcement vehicle. Section 29-20-4.

**{77}** Beyond this, I am compelled to point out the absurd results—results contradictory to the statute's intent—posed by the majority's narrow interpretation of the terms at issue. This Court has long held that "[n]o rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences." *State v. Davis*, 2003-NMSC-022, ¶ 13, 134 N.M. 172, 74 P.3d 1064 (quoting *United States v. Brown*, 333 U.S. 18, 27 (1948)). "[T]he principles of strict statutory construction of penal statutes must not override common sense and the evident statutory purpose." *Id.*; *see also State v. Llewellyn*, 1917-NMSC-031, ¶¶ 42-44, 23 N.M. 43, 167 P. 414. Officers are required by the LESPA to terminate vehicular pursuit if the danger to the community outweighs whatever benefits might flow from immediate capture of a fleeing suspect. *See* § 29-20-4(C)(2), (3). This is, of course, what occurred in Defendant Martinez's case. Accordingly, defendants may never be in a position to see markings on the body of a pursuing vehicle, particularly at night, given that this will usually entail a law enforcement vehicle following behind a defendant's vehicle. Nevertheless, the majority insists that "appropriately marked" must include prominent insignias, logos, or decals on the body of the vehicle itself, rather than emergency lights, sirens, or other "signaling" equipment. *Maj. op.* ¶ 55. The distinction is perplexing. For the reasons just stated, the *only* identifying feature of a law enforcement vehicle may be flashing red and blue lights in the defendant's rearview mirror, perhaps accompanied by a siren. The fact that other emergency departments, such as the fire department, may also have vehicles

equipped with flashing lights and/or sirens (though we have no record before us demonstrating that other emergency vehicles have the same array of equipment as the law enforcement vehicles in these cases) does not alter this reality. In short, the majority's interpretation of "appropriately marked" excludes as insufficient the only markings perceivable to a large percentage of those pursued by a law enforcement vehicle.

**{78}** Similar problems attend the majority's construction of "uniform." Again, defendants may never see the pursuing officer's uniform during flight. Yet, according to the majority, the defendant may only be convicted of aggravated fleeing if the State proves that the officer was wearing sufficiently distinctive clothing rather than a badge or other law enforcement equipment. *Maj. op.* ¶ 37-38.

**{79}** The majority maintains that a strict construction is necessary, because to do otherwise would render the terms at issue superfluous. One element of aggravated fleeing is the defendant's failure to heed a signal to stop. Section 30-22-1.1(A). The majority concludes that signaling equipment must not, therefore, constitute an "appropriately marked" vehicle because the manner of signaling and appropriate markings could then be one in the same. *Maj. op.* ¶¶ 56-58. The first problem with this argument is of course the majority's treatment of a uniform and appropriate markings as elements. Moreover, the statute itself gives an array of other examples of possible signals (separate from light or sound equipment), including signals by hand or voice. Section 30-22-1.1(A). In any event, overlapping evidence on two elements (knowledge of a signal to stop and knowledge that the signal was from law enforcement) still requires the jury to find that each was proved beyond a reasonable doubt. In the statute before us, the overlap is a natural one; it is commonsense that one of the primary identifiers of law enforcement (blue and red lights and a siren) may likewise be a means of signaling to a driver that he or she must stop. This reality does not render "appropriately marked" superfluous. Juries have the sophistication to understand that evidence may bear on multiple elements of an offense.

### III.    CONSTRUCTION OF SECTION 66-8-124(A)

**{80}** For their interpretation of "uniform," both the Court of Appeals and the majority also distinguish prior caselaw interpreting this word in the context of the statute regulating arrests for violations of the motor vehicle code. *Montano*, 2018-NMCA-047, ¶¶ 21-30; *Maj. op.* ¶¶ 24-28. However, nothing in that statute or related caselaw compels the conclusion that the Legislature intended the word "uniform" to be read strictly in the aggravated fleeing context. Rather, the caselaw interpreting "uniform," in Sections 66-8-124(A) and 66-8-125(C) support the interpretation offered here.

**{81}** Sections 66-8-124(A) and 66-8-125(C) provide that no person shall be arrested for a traffic or motor vehicle violation except by an officer wearing a "uniform." In *Archuleta*, the Court of Appeals construed the term "uniform" to have a functional significance, given that "the intention of the legislature in requiring the officer to wear a uniform plainly indicating his official status was to enable the motorist to be certain that

the officer who stops him is, in fact, a police officer." 1994-NMCA-072, ¶ 9. The Court determined that the uniform requirement is satisfied if there are either objective criteria to put the defendant on notice that an officer was indeed an officer, or subjective reasons unique to the particular defendant that established the defendant knew the arresting officer was police. *Id.* ¶ 11.

{82} Arguably, a similar test is *more* fitting in the aggravated fleeing context for the following reasons. The uniform requirement in Section 66-8-124(A) is not an aspect of the substantive motor vehicle law for which an arrest might be appropriate. No matter what an officer is wearing, speeding is speeding. By contrast, in the aggravated fleeing statute, the defendant's knowledge that the officer is law enforcement is an element of the crime, and therefore the officer's uniform is described in the statute as directly relevant to the element of knowledge. This difference between the statutes matters because, even though the Court of Appeals did not strictly construe the uniform requirement in Section 66-8-124(A), there would be some rational justification for doing so. Requiring officers who make traffic stops to dress formally gives those caught speeding or perpetrating other minor traffic crimes assurance that they are in fact dealing with a police officer during the traffic stop. This assurance comes at the marginal cost that a few speeders will avoid punishment for illegal conduct if there is not an adequate supply of uniformed officers to make traffic stops and issue citations. However, the motoring public is aware of the risk of punishment, and this potential sanction assures compliance with traffic laws generally. The same dynamic is not present if "uniform" in the aggravated fleeing statute is strictly construed. Instead, a strict construction has the pernicious effect of permitting some offenders who knowingly disobey officer commands and then flee in a manner that endangers the public to avoid criminal punishment simply because an officer's uniform and/or vehicle were not sufficiently distinctive.

{83} It is important to clarify that neither the test posed here, nor the test in *Archuleta*, eliminates a jury's authority to assess and judge what a defendant knew at the time of flight. The jury is free to find, as a matter of fact, that a defendant fleeing an officer could not be expected to discern that the person fled was police. What I do not accept is the notion that our Legislature meant to embed in the aggravated fleeing statute the presumption that a defendant can only know that he or she is fleeing police when police are formally attired and operating a vehicle with decals or insignia.

IV. **APPLICATION OF A PRAGMATIC CONSTRUCTION IN THE CONSOLIDATED CASES BEFORE US**

A. *Montano*

{84} The district court in *Montano* shared the conclusions reached in this writing. 2018-NMCA-047, ¶¶ 40-42. The court concluded that *Padilla* viewed the statute's uniform and vehicle provisions as "the backdrop against which the defendant's knowledge is evaluated because it's the defendant's knowledge of the officer that's the important thing under the statute." The court further determined that the adequacy of

the lights, sirens, or other markings on the police vehicle had to be evaluated given "the purpose of the law." Looking to that purpose, the court found that the officer's vehicle (equipped with wig wag headlights, red and blue flashing lights, a siren, and flashing brake lights) was appropriately marked "because when the lights turn on, people have the understanding they are to pull over, pull to the side of the road when they see law enforcement lights turn on." The court then explained that "when the lights turned on . . . the defendant did not stop. He actually accelerated. When [the officer] turned on his siren, the defendant accelerated more." The court also concluded that the officer's prominently-displayed badge sufficed as a uniform. The court concluded, following a bench trial, that Defendant Montano knew he was evading a police officer who had signaled him to stop.

**{85}** Because the deputy's vehicle's lights and siren would give a reasonable person notice that law enforcement was signaling him or her to stop, as would—to the extent it was observed by Defendant Montano—the deputy's prominently displayed badge, and because Defendant Montano's stepped acceleration suggests that he knew he was being signaled to stop by law enforcement, I would find that his conviction was supported by substantial evidence and should be affirmed.

### A.   *Martinez*

**{86}** The facts in Defendant Martinez's case were described at the outset of this dissent. Prior to his trial, Defendant Martinez filed a motion to dismiss, arguing that the officer's allegedly inconspicuous vehicle was not appropriately marked. After a hearing, the district court determined that the aggravated fleeing statute requires the "pursuing officer be in an appropriately marked law enforcement vehicle." Thus, although the district court had "no doubt about the veracity of [the officer's] testimony that" Defendant Martinez "recognized that he was being followed by a law enforcement vehicle even before the Deputy activated his lights and siren," the court was not persuaded that the officer's car was "appropriately marked," for reasons similar to those articulated by the majority, and dismissed the case.

**{87}** Because I would hold that an appropriately marked car is not a statutory element, that the lights and sirens on Defendant Martinez's car would notify a reasonable person of the officer's identity as law enforcement, and that evidence of Defendant Martinez's subjective knowledge should be weighed by the fact-finder, I would reverse the district court's order and remand Defendant Martinez's case for further proceedings consistent with this dissent.

## V.   CONCLUSION

**{88}** The interpretation set forth in this dissent is not an attempt to judicially amend a legislative enactment. Rather, I believe it furthers the intent of our Legislature to suppress a meaningful social evil. As Justice Holmes wisely observed, "the general purpose [of legislation] is a more important aid to the meaning than any rule which grammar or formal logic may lay down." *United States v. Whitridge*, 197 U.S. 135, 143

(1905).  Thus, "despite the 'beguiling simplicity' of parsing the words on the face of a statute, we must take care to avoid adoption of a construction that would render the statute's application absurd or unreasonable or lead to injustice or contradiction."  *State v. Strauch*, 2015-NMSC-009, ¶ 13, 345 P.3d 317 (citation omitted).  There is no reason to believe that our Legislature intended to provoke abstract debates about whether a badge is a part of a uniform or is instead an item falling into some other category of indicia of official status, nor whether a vehicle with affixed signaling equipment is "appropriately marked."  Our Legislators are pragmatic people tasked with solving real-world problems.  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Columb. L. Rev. 527, 536 (1947) ("[Statutes are] written to guide the actions of men. . . . If a statute is written for ordinary folk, it would be arbitrary not to assume that Congress intended its words to be read with the minds of ordinary men.").  The standard I propose in this dissent attempts to give effect to the Legislature's real-world solution: to criminalize high-speed chases initiated by persons who know they have been signaled to stop by law enforcement.

**JUDITH K. NAKAMURA, Chief Justice**